UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF FLORIDA

TAMPA DIVISION

Case No. 8-16-bk-00535

CHAPTER 11

In Re:

MOSLEY MOTEL OF SAINT

PETERSBURG, INC.,

     Debtor.

_____/

DEPOSITION OF FRANK GUERRA

Friday, April 1, 2016

11:00 a.m. - 12:48 p.m.

Atlis Cardinal Storage

901 Ponce de Leon Blvd., Ste. 401

Coral Gables, Florida

Reported by:

Joan Ocker, Court Reporter

Notary Public, State of Florida

Prose Court Reporting Agency, LLC

```
 1    APPEARANCES:

 2    On behalf of the Debtor:

 3        JOEL S. TREUHAFT, ESQUIRE (telephonically)
          PALM HARBOR LAW GROUP, P.A.
 4        2996 Alternate 19, Suite B
          Palm Harbor, Florida 34683
 5        Phone:  (727) 797-7799

 6    On behalf of Altis Cardinal Storage:

 7        W. PATRICK AYERS, ESQUIRE (telephonically)
          BURR & FORMAN, LLP
 8        201 North Franklin Street, Suite 3200
          Tampa, Florida 33602
 9        Phone:  (813)221-2626

10    On behalf of the City of Saint Petersbur:

11        JORDAN R. WOLFGRAM, ESQUIRE (telephonically)
          OFFICE OF THE CITY ATTORNEY
12        Post Office Box 2842
          Saint Petersburg, Florida 33731
13        Phone:  (727) 893-7401

14

15                         -    -    -

16

17

18

19

20

21

22

23

24

25
```

1                         - - -

2                  I N D E X

3                         - - -

4   WITNESS
    FRANK GUERRA
5
                                    Page
6   DIRECT EXAMINATION
    By Mr. Treuhaft.................... 5
7
    CROSS-EXAMINATION
8   By Mr. Ayers...................... 59

9

10  CERTIFICATE OF OATH............... 64
    CERTIFICATE OF REPORTER........... 65
11

12  READ AND SIGN LETTER.............. 66

13  ERRATA SHEET...................... 68

14

15

16

17

18

19

20

21

22

23

24

25

1                           - - -

2              I N D E X   O F   E X H I B I T S

3                           - - -

4                                          Page

5

DEBTOR'S EXHIBIT 1...................... 3
6   Affidavit of Service

7   DEBTOR'S EXHIBIT 2...................... 36
    E-Mails
8
    DEBTOR'S EXHIBIT 3...................... 36
9   Asset Purchase Contract

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2                       - - -

3         Deposition taken before Joan Ocker,

4      Court Reporter and Notary Public in and for

5      the State of Florida at Large, in the above

6      cause.

7                       - - -

8   Thereupon,

9                     FRANK GUERRA,

10  having been first duly sworn or affirmed, was

11  examined and testified as follows:

12                  DIRECT EXAMINATION

13  BY MR. TREUHAFT:

14      Q.    Mr. Guerra, my name is Joel Treuhaft.  I

15  am the attorney for Mosley Motel in the Chapter 11

16  bankruptcy proceedings.  We're here today to take

17  your deposition.

18            Have you ever had your deposition taken

19  before?

20      A.    Yes, sir.

21      Q.    So you are familiar with the procedures?

22      A.    Yes, sir.

23      Q.    Okay.  Very good.  Then I won't go into

24  any of the preliminaries.

25            If you can state your name and address

7733561f-db25-4738-acf8-a19dd141fc33

1    for the record.

2         A.    Frank Guerra, 901 Ponce de Leon

3    Boulevard, Suite 401, Coral Gables, Florida 33134.

4         Q.    **Mr. Guerra, what is your current**

5    **occupation?**

6         A.    Well, I'm self-employed.

7         Q.    **Okay.  As what?  How do you describe**

8    **your employment?**

9         A.    Well, I'm a manager of several companies

10   that are involved in different aspects of

11   commercial real estate.

12        Q.    **Would you say that that's the main**

13   **source of your income?**

14        A.    Yes.

15        Q.    **What is the level of education that**

16   **you've achieved?**

17        A.    Post graduate.

18        Q.    **When did you graduate high school?**

19        A.    1989.

20        Q.    **Where did you graduate high school?**

21        A.    Belen Jesuit Preparatory School.

22        Q.    **And that's where?**

23        A.    Miami, Florida.

24        Q.    **After you graduated high school, what**

25   **college did you attend?**

1      A.    Florida International University.

2      **Q.    Obviously you graduated.  With what**

3 **degree did you graduate?**

4      A.    Political science.

5      **Q.    So a Bachelor's of Science?**

6      A.    Yes, sir.

7      **Q.    When did you graduate?**

8      A.    1992.

9      **Q.    Thereafter, you said that you attended**

10 **postgraduate school.  Where did you go?**

11     A.    George Washington University.

12     **Q.    In D.C.?**

13     A.    Yes, sir.

14     **Q.    What program?**

15     A.    I was in the J.D. MBA program.

16     **Q.    When did you graduate?**

17     A.    1996.

18     **Q.    So it would be fair to say that you have**

19 **both a masters in business administration and the**

20 **juris doctorate at this point?**

21     A.    I do.

22     **Q.    After you graduated from George**

23 **Washington University, what did you do?**

24     A.    I worked at a law firm.

25     **Q.    Which law firm did you work at?**

1      A.    Adorno -- I started my career at Adorno

2  & Zeder.

3      **Q.    How long did you stay there?**

4      A.    One year.

5      **Q.    So to 1997?**

6      A.    Yes.

7      **Q.    Did you pass the bar?**

8      A.    I did.

9      **Q.    Did you take more than the Florida Bar?**

10     A.    No.  Only Florida.

11     **Q.    After Adorno where did you work?**

12     A.    At Gunster Yoakley.

13     **Q.    How long were you there?**

14     A.    One year.

15     **Q.    And Adorno, what type of law did you**

16  **practice?**

17     A.    Transactional real estate.

18     **Q.    Is that the same at the second firm?**

19     A.    Transactional real estate.

20     **Q.    Then what did you do?**

21     A.    Then I went to work for the next

22  approximately five years at Bilzin Sumberg.

23     **Q.    Same type of law, transactional real**

24  **estate?**

25     A.    Transactional real estate.

1      **Q.    And then after that?**

2      A.    Then I went into business for myself

3  developing real estate.

4      **Q.    So that would have been approximately**

5  **2004?**

6      A.    Yes, sometime between 2003 and 2004.

7      **Q.    You said developing commercial real**

8  **estate?**

9      A.    Yes.

10     **Q.    Can you estimate how many commercial**

11  **real estate projects that you have worked on since**

12  **2004?**

13     A.    Developing or in what capacity?

14     **Q.    You tell me.  I'm just trying to**

15  **understand what you do in the areas that you work**

16  **in.**

17     A.    Well, in some cases we develop ground up

18  construction and development.  In other cases we

19  take existing assets and reposition them or

20  refurbish them, renovate them, do whatever is

21  called for with respect to the particular asset.

22     **Q.    Do you have a named operating entity**

23  **that you work out of, or do you develop each**

24  **project on their own as a separate standalone**

25  **project?**

1          A.     Every project has a single purpose

2     entity associated with it to the extent that we

3     acquire and/or develop.  As you know, that's

4     required in the event of any lender involvement.

5          **Q.     But do you have either a holding company**

6     **or a company that acts as an administrative**

7     **oversight or umbrella?**

8          A.     No.  Each property stands on its own.

9     When we engage in service-oriented engagements,

10    either as manager or somehow serving a client with

11    respect to consulting, servicing, managing,

12    something like that, we use a service entity that

13    we own, but each one of the companies stands on

14    its own with its own structure, it's own set of

15    managers.  There is a different composition of

16    ownership in virtually every single one.

17         **Q.     Do you own each of these entities**

18    **outright, or do you have different partners or**

19    **members in the different entities?**

20         A.     Well, I always have partners.  If you're

21    talking about Frank Guerra, there's always at

22    least one other partner, and in some cases ten

23    other partners.

24         **Q.     So you develop each of these projects**

25    **with at least one other person?**

1      A.    Yes.

2      **Q.    Would that be fair?**

3      A.    (Nods head.)

4      **Q.    Now, do those people bring the projects**

5 **to you, or do you bring those projects to them?**

6      A.    It depends.  Sometimes third parties

7 bring projects.  Sometimes we ferret out the

8 projects ourselves.

9      **Q.    Now, looking through the Florida**

10 **Department of State Records, it appears that a lot**

11 **of your entities have the word Altis in front of**

12 **them.  Is that a fair statement?**

13      A.    Yes.

14      **Q.    Hold on one second, please.**

15      **(Pause)**

16      **Would it be fair to say that most of**

17 **your real estate development companies are Altis**

18 **or Altis and another name?**

19      A.    Your question isn't very clear, but if

20 what you're trying to say is that the word Altis

21 is in the entity name on various entities, then

22 the answer is, yes.

23      **Q.    Would that be the flagship, for lack of**

24 **a better term, that most of your real estate**

25 **projects are under, or do you have other projects**

1  under other names as well?

2      A.    Each project stands alone with its own

3  name, whether we add the Altis name or not.  They

4  are all standalone entities.

5      Q.    Now, are you familiar with a gentleman

6  by the name of Alex Umana?

7      A.    Yes, I am.

8      Q.    How did you come to know Mr. Umana?

9      A.    Well, at some point several years ago,

10  he came to Miami and was trying to put deals

11  together between different parties.  He claimed to

12  have investors from other places outside of Miami,

13  including Canada, and he was trying to put deals

14  together during the downturn.

15      Q.    During the downturn, meaning 2008, 2009?

16      A.    Correct.

17      Q.    Did he have his own company, or was he

18  working with you?

19      A.    No.  He has never been employed by us.

20      Q.    Are you familiar with a company by the

21  name of Aju real estate -- let me get the exact

22  name.  Are you familiar with

23  ajurealestatestrategies.com?

24      A.    I am aware that he uses that name for

25  some company that he claims to represent.

1  **Q. Are you familiar with the company by the**

2 **name of Aju Real Estate Investments, LLC?**

3  A. I can't recall that specific name.

4  **Q. Do you know of what significance the**

5 **name Aju is?**

6  A. I imagine it has something to do with

7 his initials.

8  **Q. Alex J.  Umana?**

9  A. Yes, sir.

10  **Q. I notice that there is an entity that is**

11 **formed called Altis-Aju, is it Skyline or Sky**

12 **View?**

13  A. There is an Altis called Altis-Aju

14 Skyline.

15  **Q. What is that company?**

16  A. That is the company that owns an

17 apartment building in Saint Petersburg.

18  **Q. Where is the apartment building located**

19 **in relation to the Mosley Motel?**

20  A. About a block away.

21  **Q. About a block away?**

22  A. Between a block and a block and a half.

23  **Q. All right.  Does it abut the Mosley**

24 **Motel property?**

25  A. No.

1       **Q.**   **Did Mr. Umana have anything to do with**

2  **the acquisition of this property?**

3       A.   Which property?

4       **Q.**   **The Altis-Aju Skyline property?**

5       A.   Yes.

6       **Q.**   **How was he so involved?**

7       A.   He was a finder.  He located the

8  property and presented it to us as a possible

9  acquisition.

10      **Q.**   **Did he get compensation with regard to**

11  **that?**

12      A.   He received a fee.

13      **Q.**   **Do you remember how much of a fee he**

14  **received?**

15      A.   No.

16      **Q.**   **Do you recall approximately when that**

17  **occurred?**

18      A.   That transaction took place in 2012.

19      **Q.**   **2012?**

20      A.   Yes.

21      **Q.**   **Now, I had sent your attorney a copy of**

22  **the document that is filed in the Southern**

23  **District of New York Bankruptcy Court.  If you'll**

24  **hold on a second -- did your attorney happen to**

25  **send you a copy of that e-mail?**

1          A.    Regarding a bankruptcy filing in the

2     State of New York?  No.

3          **Q.    Do you have an e-mail address that I can**

4     **send it to you?**

5          A.    I'm sure that my attorney can send it to

6     me.

7                MR. TREUHAFT:  Patrick?

8                MR. AYERS:  I'm looking for that e-mail

9          that you sent me, Joel.

10               MR. TREUHAFT:  I can forward it to you,

11         if you would like.

12               MR. AYERS:  Why don't you do that right

13         now, then I'll forward it on to Mr. Guerra.

14               MR. TREUHAFT:  All right.  Just one

15         second.

16               MR. WOLFGRAM:  Joel, if you want to copy

17         me on that e-mail so I can follow along, that

18         would be great.

19               MR. TREUHALF:  I suppose that we can do

20         that.  That seems almost fair.

21               The document is titled Altis Umana

22         Document.

23     BY MR. TREUHAFT:

24         **Q.    The bankruptcy case was FL 608 Spirits**

25     **LLC.  This was pending in the Southern District of**

1    New York.

2               Does that name mean anything to you,

3    Mr. Guerra?

4         A.    No.

5         Q.    Well, when your attorney has the ability

6    to forward you the e-mail that I just sent, if you

7    go to Page 22, you will see that there is an

8    entity called Altis-Aju at 175 7th Avenue

9    Southwest Miami, Florida address which appears to

10   be, or at least was the principle office for the

11   Altis-Aju Skyline entity.  It's signed by

12   Mr. Umana.  And it says that Altis-Aju is an

13   interested party with regard to the sale of the

14   real estate, which is the subject of this

15   bankruptcy filing.

16        A.    I'm not aware of any entity called

17   Altis-Aju.

18        Q.    I assume that it is a shortening of the

19   Altis-Aju property.

20              Did Mr. Umana ever share offices with

21   you?

22        A.    No.

23        Q.    Did he ever have authority to act on

24   behalf of the Altis-Aju entity?

25        A.    Absolutely not.

 1       **Q.    Altis-Aju Skyline.**

 2       A.    Absolutely not.  He is not an officer.

 3  He is not a manager.  He has no interest.  He has

 4  no authority to represent or bind any Altis entity

 5  that I'm involved in.

 6       **Q.    And yet here he is filing documents on**

 7  **your behalf, or at least in a New York bankruptcy.**

 8       A.    I would like to see the document you're

 9  referring to, because to my knowledge, I have

10  never been involved in any bankruptcy proceeding

11  in New York or any other district in the entire

12  United States.

13            MR. TREUHAFT:  Patrick, have you

14       received the e-mail?

15            MR. AYERS:  I did, and I have forwarded

16       it on to Mr. Guerra.

17            THE WITNESS:  If I could have 20 seconds

18       to get my laptop so I can see this document.

19            MR. TREUHAFT:  Absolutely.  Please.

20            (Off the record.)

21            THE WITNESS:  Okay.  Give me a moment

22       while I open my laptop.

23            MR. TREUHAFT:  Not a problem.  It will

24       be on Page 22, and it will be the 13th line

25       down.

1           MR. AYERS:  Just for reference, I think

2       the document is 30 pages.  So is that Page 22

3       of 30?

4           MR. TREUHAFT:  Yes, Page 22 of 30, as

5       you are reading the court header that they

6       impose when you file electronically.

7           THE WITNESS:  Is the document I'm

8       supposed to be looking at one that says AJU

9       Real Estate Investments?

10          MR. TREUHAFT:  No.  The one that says

11      Altis Umana Document.

12          MR. AYERS:  The first that's attached in

13      the e-mail.

14          THE WITNESS:  Is this the one entitled

15      FL 6801 Spirits?

16  BY MR. TREUHAFT:

17      Q.   Yes, that's the one.  Go down to Page 22

18  of that document.

19      A.   Yes.

20      Q.   Then, if you look 13 lines down under

21  Ultima Ventures.

22      A.   Under what?

23      Q.   Well, Ultima Ventures is in bold and all

24  caps, so it's easier to see the one underneath it

25  that says Altis-Aju.  Do you see what I'm

1    **referring to?**

2          A.     There is nothing coming out bold.  Let

3    me make sure we're on the same page.  The first

4    entry is 13 Floor Investments.

5          **Q.     The first page says --**

6          A.     Then Altis-Aju.

7          **Q.     Yes.**

8          A.     Okay.  I see what you are referencing.

9          **Q.     If you go across, it has an address**

10   **which appears to be the former address for**

11   **Altis-Aju Skyline, correct?**

12         A.     That is what that reflects, yes.

13         **Q.     So what I'm asking is, why would**

14   **Mr. Umana be filing documents apparently on behalf**

15   **of Altis-Aju Skyline if he had nothing to do with**

16   **it?**

17         A.     That entity doesn't exist, Altis-Aju.

18         **Q.     Okay.**

19         A.     So I'm not sure what Mr. Umana was

20   trying to accomplish.  But I will be happy to

21   provide you affidavits regarding the authorized

22   members of each of the Altis entities, and it will

23   reflect, and I say to you under oath and on the

24   record, that Alex Umana has never been authorized

25   to act on behalf of any entity that I am involved

7733561f-db25-4738-acf8-a19dd141fc33

1    in, has never been an officer, has never been a

2    manager of any entity that I am an owner of or

3    that is under one of the properties that we have

4    acquired directly or indirectly.

5        Q.    Now, can I ask you, how did you choose

6    the name Altis-Aju?  Did it have anything to do

7    with Alex Umana?

8        A.    Yes.  He insisted that his initials be

9    involved on properties that he brought to us that

10   we ultimately acquired.

11       Q.    Is Altis-Aju also registered in the

12   State of Nevada?

13       A.    Altis-Aju, I'm going to reiterate, it

14   does not exist.  If you look on sunbiz.org where

15   all of our companies are registered, you will see

16   there is no such thing as an Altis-Aju entity.

17       Q.    Altis-Aju Skyline LLC, is that also

18   registered in Nevada?

19       A.    No, not by us.  The properties are in

20   Florida, and we are in Florida.  Why would we

21   register that in Nevada?  No.

22       Q.    I think that if you were to look, that

23   Altis-Aju Skyline LLC is also registered in Nevada

24   with you as the manager.

25       A.    That is incorrect.  Altis-Aju Skyline is

1    not registered in Nevada.

2         **Q.    I'm not going to interrupt the**

3    **deposition right now, but I'll be more than happy**

4    **to send you documents that represent that it is.**

5         A.    I believe it is incorrect.  Altis-Aju

6    Skyline is not registered there.  Only I would

7    have the power to file it in Nevada.  We do not

8    have any reason to file a Florida entity for

9    Florida real estate in Nevada.

10        **Q.    Do you have real estate in Nevada?**

11        A.    Yes, we do.

12        **Q.    Under an Altis-Aju entity name?**

13        A.    There is an Altis-Aju Smithridge in

14   Nevada, but it is impossible for there to be an

15   Altis-Aju Skyline in Nevada.

16        **Q.    Okay.**

17        A.    We also have another property in Reno

18   under the name Altis Cardinal Vista, where there

19   is no A.J.U.  We also have T.M. Altis 901.  It's

20   an office building we own in Miami with no A.J.U.

21   We also have T.M.S. Altis 5040, another office

22   building we own in Miami with no A.J.U., to make

23   things clear for you.

24        **Q.    Okay.  So when was the last time that**

25   **you worked with Mr. Umana?**

1          A.     Oh, we get e-mails forwarding potential

2     deals from Alex Umana periodically.  He sometimes

3     sends us a flurry of e-mails in a week, and then

4     we don't hear from him for two or three or four or

5     more months, and then he will surface again.

6          **Q.     When was the last time you heard from**

7     **Mr. Umana?**

8          A.     As recently as this week I received an

9     e-mail from him.

10         **Q.     To your knowledge, where is Mr. Umana?**

11         A.     My understanding is that, the last time

12    I heard, he was in Colombia, in Medellin, and he

13    actually tried to forward two deals to us in

14    Medellin to acquire and/or invest in and develop,

15    and we did not entertain those.

16         **Q.     Was Mr. Umana authorized to act on your**

17    **behalf with regards to the Mosley Motel?**

18         A.     Absolutely not.

19         **Q.     Was Mr. Umana attempting to act as a**

20    **finder for the Mosley Motel on your behalf?**

21         A.     I don't know if he was attempting to act

22    on our behalf.  His history is to try to find

23    deals and then present them to whomever he can to

24    try to capitalize the deal and get that person to

25    move forward on the deal.  He has done this with

1  groups that are not affiliated with us, and he has

2  done this with groups that are affiliates of ours.

3        Q.    But it's your testimony today that

4  Mr. Umana was not authorized to act on your behalf

5  with regard to any transaction or potential

6  transaction involving the Mosley Motel?

7        A.    I am testifying that he has and never

8  has had any authority to act on our behalf or to

9  bind us in any capacity whatsoever.  And by "us,"

10  I mean, Altis or any related or affiliated entity.

11        Q.    Okay.  So would you be surprised to

12  learn that Mr. Umana was in contact with your

13  attorney, or your attorney now, Mr. Ayers, while

14  he was an attorney for CN and HSBC, and for

15  Mr. Shimshoni as principal of the Mosley Motel

16  with regard to Altis' potential interest in the

17  purchase of the Mosley Motel?

18        A.    I'm not going speculate as to particular

19  facts, but what he did --

20        Q.    I mean, would it surprise you?

21        A.    It would not surprise me that he would

22  talk to anybody that he thought would lead to a

23  potential deal that he could get somebody else,

24  including us, to fund.

25        Q.    Now, do you have a development agreement

1    with the City of Saint Petersburg?

2         A.    No.

3         Q.    Does an Altis entity have a development

4    agreement with the City of Saint Petersburg?

5         A.    A development agreement with respect to

6    what?

7         Q.    The development of property.

8         A.    We do not have any development agreement

9    with the City of Saint Petersburg.

10        Q.    Neither you nor any Altis entity that

11   you are aware of?

12        A.    I take it to mean when you say

13   "development agreement," you mean an

14   agreement/contract between an Altis entity and the

15   City of Saint Petersburg as a municipality with

16   respect the development of a particular property;

17   is that correct?

18        Q.    Yes.

19        A.    Okay.  No, we do not have any such

20   agreement.

21        Q.    Do you have any agreements with the City

22   of Saint Petersburg?

23        A.    No, we do not.

24        Q.    Are you currently planning a development

25   that involves the property, the Mosley Motel

1   **property, and a property situated contiguous to**

2   **it?**

3        A.    The properties you are referencing stand

4   alone and do not depend on each other as of today.

5        **Q.    I understand they do not depend on each**

6   **other, but is it your plan to utilize the**

7   **properties which are contiguous and develop them**

8   **into a different type of structure or a different**

9   **project?**

10       A.    With respect to which property, Mr.

11   Treuhaft?

12       **Q.    With regard to either the Mosley Motel**

13   **or the property which is contiguous to the Mosley**

14   **Motel, or both of those properties?**

15       A.    You're combining several different

16   parcels, and the answer is not the same with

17   respect to all of them, so I'll make it more clear

18   for you.

19            There are portions of the property that

20   will stay as is -- portions of those parcels that

21   will stay as is, and there will be portions that

22   will be redeveloped.

23       **Q.    Does the redevelopment plan include the**

24   **parcel that would be the Mosley Motel?**

25       A.    Whatever occurs on the Mosley Motel,

1  whether keeping it as is or redeveloping, would

2  stand on its own as a separate entity with a

3  separate ownership structure.

4        Q.    That's not my question, sir.  My

5  question is that as we sit here today, are there

6  plans to redevelop the Mosley Motel?

7        A.    One of our options is redevelopment of

8  the parcel on which the Mosley Motel stands,

9  currently sits.

10       Q.    What are the other options?

11       A.    To leave it as is.

12       Q.    To leave it as is, you would then

13  operate the motel?

14       A.    No.  We could just raze the motel and

15  leave it as vacant land and not redevelop it.

16       Q.    Is that what your plans are?

17       A.    I just told you, we have various options

18  with respect to that parcel.

19       Q.    When do you intend to make a decision

20  with how you are going to proceed?

21       A.    We make all of our decisions based on

22  market conditions at the time we make whatever

23  decision we make.  At this moment I don't know

24  when/if we will control that parcel.  So until

25  such time as we control the fee ownership of the

1   parcel, we don't have to make a decision.

2        Q.    I see.  When did you first become

3   interested in the Mosley Motel?

4        A.    I don't recall a particular date,

5   Mr. Treuhaft.

6        Q.    Do you have a general time frame?

7        A.    Sometime in the year 2015.

8        Q.    Did you ever authorize Mr. Umana -- or

9   did Mr. Umana ever contact you in 2013 with regard

10  to the Mosley Motel?

11       A.    With regard to the purchase of the

12  Mosley Motel?

13       Q.    Yes.

14       A.    I don't recall.

15       Q.    So with regard to your interest in 2015,

16  how did that evolve?

17       A.    Well, Alex at some point said to us that

18  he thought that the parcel could be acquired.

19       Q.    In what manner?

20       A.    Through a purchase.

21       Q.    How did he communicate that?

22       A.    I don't recall if it was via phone call

23  or -- most all of our conversations are via phone

24  call, but I don't specifically recall the medium

25  used for this particular question that you're

7733561f-db25-4738-acf8-a19dd141fc33

1  asking.

2      Q.    Does he ever communicate with you by

3  either e-mail or by text?

4      A.    He has communicated by e-mail,

5  particularly when he is sending over graphics or

6  surveys or some sort of attachment.

7      Q.    Has he communicated with you by e-mail

8  with regard to the Mosley Motel?

9      A.    He may have.

10      Q.    Have you provided copies of those

11  e-mails pursuant to our request for production?

12      A.    I provided everything I could find in my

13  e-mail search regarding the Mosley Motel to our

14  counsel.

15      Q.    I would represent that I don't see any

16  correspondence between you and Mr. Umana in what

17  has been produced.  Let me just say, I don't see

18  any e-mails between you and Mr. Umana in what's

19  been produced.  I would request then if you would

20  look again to see if there is any such

21  correspondence.

22      A.    I believe that I turned over e-mails

23  that included Mr. Umana relative to documentation

24  that was exchanged between John Cappa and myself,

25  so I'm not sure how you conclude that there were

7733561f-db25-4738-acf8-a19dd141fc33

1  no e-mails involving Alex Umana that were turned

2  over.

3     Q.    I did get an e-mail from Mr. Cappa to

4  Mr. Ayers that included the financial, what I'll

5  call proof of funds, for both you and Mr. Suarez,

6  but I don't see the e-mail that was transmitted

7  from you to Mr. Cappa.  So I'll look again, and

8  maybe that's just something that just hasn't been

9  transmitted yet.  We'll take a look.

10          So, going back, Mr. Umana indicated that

11  there might be an opportunity for you to acquire

12  the Mosley Motel?

13     A.    Yes.

14     Q.    Do you recall when that occurred?

15     A.    Again, sometime in 2015.  I do not

16  recall the specific date.

17     Q.    So you don't remember whether it was

18  January or May?

19     A.    No.  Sitting here today, I do not know.

20     Q.    You don't have anything that would help

21  refresh your recollection?

22     A.    As to when he told me that the parcel

23  might be available?  No.

24     Q.    Yes.

25     A.    No.  The only documentation that I can

1  go by --

2      Q.    **Do you recall what occurred next?**

3      A.    I'm sorry?

4      Q.    **What do you recall occurred next?**

5      A.    Well, Alex would continually represent

6  whenever we spoke that he was "working on the

7  deal," quote, unquote.

8      Q.    **And approximately how often did you**

9  **speak?**

10     A.    I don't know.  Sometimes we would speak

11  a few times a week, and sometimes weeks would go

12  by where we wouldn't speak at all.

13     Q.    **Then were you ever asked to do anything?**

14     A.    The only time that I was asked to do

15  something was when Mr. Cappa got involved, who

16  represented himself at the time to be the attorney

17  for the Mosley Motel, and we exchanged documents

18  with terms in them for the possible purchase of

19  the Mosley Motel property.

20     Q.    **What do you recall that you were willing**

21  **to pay for the purchase of the Mosley Motel**

22  **property?**

23     A.    Well, that was one of the various terms

24  that was exchanged.  So subject to various

25  conditions that we laid out, the ultimate purchase

7733561f-db25-4738-acf8-a19dd141fc33

1  price would have been 2.4 million.

2      Q.    So you did agree at one point in time to

3  pay $2.4 million for the property?

4      A.    No.  We never reached an agreement at

5  all.  Quite the contrary.

6      Q.    Well, where did the $2.4 million come

7  from?

8      A.    As I said, it was one of the terms

9  amongst many others that were transmitted, and our

10  terms were rejected by the powers that be through

11  John Cappa at the Mosley Motel.

12      Q.    Do you have an e-mail -- I, quite

13  frankly, have not seen any of these e-mails.

14          MR. TREUHAFT:  Patrick, are you aware of

15      the e-mails that Mr. Guerra is referring to?

16      Do you have copies of them?  Were they part of

17      the 156 pages that have been produced to us?

18          MR. AYERS:  I'm not sure that Mr. Guerra

19      testified that there were e-mails back, a

20      formal e-mail rejecting an offer.  Whatever I

21      have received, Joel, I have produced to you.

22      So whatever I have --

23          MR. TREUHAFT:  I can't believe that,

24      that of the 156 pages I've received, I don't

25      see any of them as correspondence between

1          Mr. Guerra and Mr. Cappa.

2                  THE WITNESS:  Pat, I forwarded e-mails

3          between John Cappa and myself, including

4          e-mails with red lines of documents were sent

5          back and forth because the terms were not

6          agreed to.  More importantly --

7                  MR. TREUHAFT:  This would have been

8          prior to your representation of Mr. Guerra.

9          This would have been during February, March or

10         April of 2015, and so they would have been

11         directly between Mr. Guerra and Mr. Cappa.

12         And I thought that I heard Mr. Guerra say that

13         he looked through his e-mail server and that

14         he provided you with copies of all of his

15         correspondence that he had with Mr. Cappa.

16                 THE WITNESS:  Yes, I did.

17                 MR. AYERS:  So --

18    BY MR. TREUHAFT:

19         Q.     **Did I mishear that, Mr. Guerra?**

20         A.     No.  I forwarded my correspondence with

21    Mr. Cappa to Mr. Ayers.

22                 MR. AYERS:  And the Bate stamped

23         documents, Joel, that I sent to you numbered

24         1, I forget where they end, included whatever

25         documents I received from Mr. Guerra.

1          MR. TREUHAFT:  Okay.

2          THE WITNESS:  And in those documents you

3     will see -- in those e-mails you will see

4     documents with proposed terms.

5  BY MR. TREUHAFT:

6     Q.    I see in an e-mail dated March 16th with

7  a purchase contract for $1.6 million.  I do not

8  see any documents with reference to a $2.4 million

9  number.  There's a second contract for apparently

10 $800,000.

11    A.    That is correct.

12    Q.    It seems to be with Contreras and

13 Camacho?

14    A.    I'm sorry?

15    Q.    With Contreras & Camacho, P.A.

16 performing an escrow service for you?

17    A.    If there was a transaction that was

18 going to move forward, they were going to be our

19 real estate counsel, and they would have been

20 holding escrow and writing title.  But since the

21 transaction did not move forward, then we had no

22 need for them.

23    Q.    All right.  I see an e-mail dated

24 March 16th -- excuse me -- March 18th from John

25 Cappa to you that says, "Hello, Frank and Alex.

1  Please see the changes in the contract and

2  addendum that Mr. Shimshoni has made."

3          It says, "I, the seller, will split the

4  closing cost, buyer will pay the full year of

5  taxes for 2015.  The property will be delivered

6  with no leases or tenants on or before August 2015

7  or there will be $100 a day penalty.  Please let

8  me know if these changes are agreeable."

9      A.    Yes.

10     Q.    I do not see any communication or

11 correspondence after that.

12     A.    No.  I spoke to Mr. Cappa --

13     Q.    Was it not agreeable then?  What is your

14 recollection?

15     A.    Those changes were most certainly not

16 agreeable, and that was discussed at length with

17 Mr. Cappa.

18          Essentially the end result of what you

19 just read, which was their proposal to our

20 absolute and not a variant term, or variable term,

21 whatsoever was the vacancy of the property once it

22 was turned over to us was obviated by their

23 proposal.  Essentially what they were proposing is

24 that we give them the full purchase price, and

25 then there would be a penalty afterwards that we

1  would have to chase them for, and I said

2  absolutely not.  If we reach an agreement, all the

3  money will have to remain in escrow until all

4  terms that we agree to are met.

5          So after that discussion, Mr. Cappa

6  advised that Mr. Shimshoni was not amenable, would

7  not agree to that, and that was a nonstarter.

8  And, as you will notice, no signed document ever

9  came from Cappa, Shimshoni, the Mosley Motel.

10  Nobody ever accepted any of the terms, let alone

11  consummated any kind of contract that would lead

12  to a transaction.  As a matter of fact, it was a

13  complete opposite.  They terminated discussions

14  with us because the terms were not acceptable to

15  Mr. Cappa and/or Mr. Shimshoni.

16      Q.    Now, I'm looking, and I see that on the

17  18th of March, Mr. Cappa proposes a new addendum

18  that has a $5,000 a day penalty, and the property

19  possession free by July 15th.

20      A.    Right, which also was unacceptable

21  because, as I said to him from the beginning, a

22  fundamental term of what we proposed was that the

23  purchase price would not be released until the

24  terms were met.  We were not putting ourselves in

25  a position to chase people around to collect

1  penalties because they didn't perform a

2  post-closing obligation.  We told him that was a

3  nonstarter.  Then he said that it was a nonstarter

4  to hold himself to vacating the property or having

5  it vacated prior to a closing.  We got to an

6  impasse at that point and everybody moved on.

7       Q.    Now, I do see an e-mail between you and

8  Mr. Umana dated the 20th of March.  It's No. 24 on

9  the Bate stamp that Mr. Ayers has provided to me.

10  At 342 Mr. Umana says, "I'm responding to the

11  addendum the way I read it.  I doubt that they

12  will waive 90 days."

13            And your response to that is, "Yes,

14  correct."

15       A.    Exactly as I said, we were not releasing

16  any closing funds until the terms that we set out,

17  including vacancy of the motel property, were met,

18  whether it was to the bank or to the Mosley, or to

19  however they were going to divide it on their

20  side.  I don't know what was going to happen

21  there.  I only know what was happening on my side

22  of the deal.

23       Q.    Did you ever speak with a Joseph

24  Perlman?

25       A.    I don't recall that name.

1        Q.    **Do you recall receiving e-mails from**

2   **Mr. Perlman with an attached contract?**

3        A.    I would have to see the e-mail you're

4   referring to refresh my memory.  I do not

5   recollect an e-mail from a Mr. Perlman.

6        Q.    **Hold on a second.**

7        A.    While you're doing that, can I take a

8   quick bathroom break?

9             MR. TREUHAFT:  Absolutely.  Off the

10            record.

11            (Thereupon, a brief recess was taken.)

12            MR. TREUHAFT:  Patrick, I just forwarded

13            you an e-mail from Joe Perlman which attaches

14            a series of e-mails from May 28, 2015 between

15            him and Alex Umana.  I'm now going to forward

16            you copies of the documents that were not

17            attached.

18            MR. AYERS:  I just got your first

19            e-mail.  I'll send that onto him now.

20            MR. TREUHAFT:  Jordan, I sent you a copy

21            as well.

22            MR. WOLFGRAM:  Thank you.  I appreciate

23            it.

24   BY MR. TREUHAFT:

25        Q.    **Mr. Guerra, when you have received the**

1   **e-mail from your attorney, if you would let me**

2   **know.**

3      A.    Sure.

4          Okay.  I've got the first one.

5      **Q.**    **While we are waiting for those to come**

6   **through, do you have the ability to print those**

7   **e-mails that you've received?**

8      A.    Print the e-mails I've received here

9   while we've been talking?

10     **Q.**    **Yes.**

11     A.    Yes.

12         MR. TREUHAFT:  If you could have that

13        attachment to the first e-mail, mark that as

14        No. 1.

15         THE WITNESS:  You are talking about

16        United States Bankruptcy Court Southern

17        District?

18         MR. TREUHAFT:  Right.  That will be No.

19        1.

20         (Thereupon, Debtor's Exhibit No. 1 was

21        marked for identification.)

22         MR. TREUHAFT:  No. 2 will be Composite

23        Exhibit 2, that series of e-mails underneath

24        the forwarded e-mails that I just sent that

25        you just got.

1             (Thereupon, Debtor's Exhibit No. 2 was

2        marked for Identification.)

3             MR. TREUHAFT:  And then Composite

4        Exhibit 3 will be the attachments, the Asset

5        Purchase Agreement and the asset list.

6             (Thereupon, Debtor's Exhibit No. 3 was

7        marked for Identification.)

8   BY MR. TREUHAFT:

9        Q.   **Now, if you'll take a moment and look**

10  **through what has been now marked Exhibit 2.**

11       A.   Exhibit 2 is the e-mails?

12       Q.   **Yes, the series of e-mails.**

13       A.   Yes.

14       Q.   **Do those e-mails refresh your**

15  **recollection at all?**

16       A.   Yes.

17       Q.   **Can you tell me what was happening**

18  **around May 28th or May 29th, 2015 with relation to**

19  **the purchase or proposed purchase of the Mosley**

20  **Motel?**

21       A.   Well, I think that the document speaks

22  for itself.  It says that the closing needs to be

23  defined as well as the lender's approval of the

24  transaction.  It says that we're waiting -- or

25  somebody is waiting for a contract from John

1  Cappa, a proposed contract, I suppose.  And it

2  talks about proof of -- proof in terms of

3  verifying that the residents have or have not

4  vacated the asset.  Yes, which was a fundamental

5  term.

6          So that's what was going on.  It's

7  pretty self-evident.

8          Q.    And then could you look at what's now

9  listed as No. 3, the Asset Purchase Agreement?

10  Have you ever seen that document before?

11         A.    I'm going to it now.

12               I do not recall seeing this before.

13  This is different than the form that I provided to

14  my attorney, Mr. Ayers, as the contract that I had

15  received from Mr. Cappa.  I do not recall seeing

16  this.

17         Q.    Was Mr. Umana authorized to negotiate on

18  your behalf with Mr. Perlman as to these terms?

19         A.    Absolutely not.

20         Q.    So Mr. Umana was authorized to negotiate

21  with Cappa, but not authorized to negotiate with

22  Perlman?

23         A.    He was not authorized to negotiate with

24  Cappa.  Absolutely not, under no circumstances.

25         Q.    So what you believe, the deal fell apart

1   **as a result of Mosley's refusal to commit to a**

2   **date certain for the vacating of the tenants?**

3         A.    Not only would they refuse to commit to

4   a date certain, they refused to defer the closing

5   proceeds until such time as the hotel was vacant.

6   They said that that was a nonstarter and that they

7   could never commit themselves to that.  And then

8   we said, okay, we're done.  That's a fundamental

9   term on our side.  It's a nonstarter for us.

10        Q.    **Was there ever any communication saying**

11  **that you were no longer going to negotiate?**

12        A.    Oh, I made that abundantly clear to

13  Mr. Cappa.

14        Q.    **Orally or through correspondence?**

15        A.    I'm absolutely positive that I had

16  several oral exchanges with him regarding that.  I

17  don't recall what was committed to writing or

18  wasn't, but I can tell you what was not committed

19  to writing, which was that nobody signed the

20  agreement, the proposed agreement.

21        Q.    **So was Mr. Umana's compensation tied to**

22  **the acquisition of the Mosley Motel in this**

23  **matter?**

24        A.    It would have been.  If a transaction

25  had been consummated, he would have been

1  compensated, yes.

2       Q.    So if he continued to negotiate with

3  Mr. Perlman, would he have done that on his own?

4       A.    I'm not sure.  You are going to have to

5  ask him.  You are asking me to speculate.  I can

6  only tell you that he was not authorized to bind

7  us with respect to any discussions that he had

8  with any party.  What he did on his own to try to

9  get people to consummate a transaction, that's up

10 to him.  But he was certainly not authorized to

11 act on our behalf whatsoever.

12      Q.    Are you a member of any community

13 associations in Saint Petersburg, or any of your

14 entities?

15      A.    You are going to have to clarify that.

16 I am not a member of any community association in

17 Saint Petersburg, no.

18      Q.    Are any of your entities a member of a

19 community association?

20      A.    Could you define community association?

21      Q.    Apparently there is an association of

22 businesses, or at least that's what has been

23 represented to me, that look out for common

24 interests in the area around where the Mosley

25 Motel or your other properties are situated.

1        A.    Okay.

2        Q.    **Like a merchant's group or something**

3    **like that.**

4        A.    Okay.

5        Q.    **I am not aware of any one in particular.**

6    **I've just been told yesterday that they exist.**

7        A.    I am not aware of any such merchant

8    group, and I do not have any ongoing involvement

9    or have had any involvement in a merchant group

10    focused on this neighborhood, no.

11        Q.    **Have you or any of your agents on behalf**

12    **of yourself or any of the Altis entities contacted**

13    **the City of Saint Petersburg with regard to**

14    **nuisance abatements at the Mosley Motel?**

15        A.    I am not aware of any contact we have

16    made with the nuisance abatement board in either

17    direction.

18        Q.    **Have you made any complaints to the**

19    **police department?**

20        A.    I have not made any complaints to the

21    police department.

22        Q.    **Do you know if Mr. Umana made any**

23    **complaints to the police department?**

24        A.    I do not know.

25        Q.    **Or the nuisance abatement court.**

1        A.      I am not aware of any.

2        Q.      **So it's your testimony that you did not**

3  **cause to have a nuisance abatement complaint filed**

4  **against the Mosley Motel?**

5        A.      I took no action with respect to any

6  nuisance abatement activity, no.

7        Q.      **So at what point did you believe that**

8  **your negotiations with the Mosley Motel for the**

9  **acquisition of the property ceased?  When did you**

10  **withdraw from negotiations?**

11        A.      When Mr. Cappa and/or his clients stated

12  categorically that it was a nonstarter to defer

13  the disbursement, or to make the disbursement of

14  closing monies contingent on the delivery of clear

15  title and a vacant motel.

16        Q.      **And when do you believe that took place,**

17  **to the best of your recollection?**

18        A.      I don't recall the specific date, but it

19  was around the same time frame that we were

20  exchanging the documents and the proposed addendum

21  that continued getting revised back and forth

22  because terms could not be agreed to.

23        Q.      **So that would have been late March,**

24  **early April 2015?**

25        A.      I don't recall the time frame.

1      Q.    And the flurry of activity at the end of

2  May, that was just a last gasp effort in your

3  mind?

4      A.    By whom?

5      Q.    By either Alex or by the Mosley Motel.

6      A.    That would call for me to speculate, and

7  I'm not in a position to speculate on that.  I

8  only evaluate what's put in front of me.

9           I made clear what terms were acceptable

10  to us.  The terms were not acceptable to the other

11  side, and that's it.  I don't know anything about

12  last gasp efforts.

13      Q.    I understand.

14           Do you recall seeing those May 28th and

15  29th e-mails between Mr. Umana and Mr. Perlman?

16      A.    Yes.

17      Q.    At that point in time, did you believe

18  that negotiations were over, or were you hopeful

19  that they might still be able to work something

20  out?

21      A.    I don't recall on this particular date

22  what my state of mind was.

23           I'm going to reiterate to you what I

24  reiterated to Mr. Cappa over and over and over

25  again.  Our terms were very clear and they were

7733561f-db25-4738-acf8-a19dd141fc33

1  not negotiable.  If they were not acceptable to

2  his client, then we weren't going to be able to

3  consummate a transaction.  He made it clear that

4  they were categorically unacceptable to his

5  client, and we both walked away.  Whether it was

6  on May 28th, 29th or June 1st, June -- I really

7  don't remember a particular date, but I can tell

8  you that the discussion was had very clearly about

9  what terms were acceptable and nonnegotiable, and

10  we did not have a meeting of the minds.

11      Q.    **Do you recall there being a discussion**

12  **that the nuisance abatement action went through**

13  **and the Mosley Motel didn't defend, that all the**

14  **tenants would be forced to be vacate as a result**

15  **of the city's action?**

16      A.    Mr. Cappa advised me that Mr. Shimshoni

17  had suggested to him that that was an indirect way

18  of assuring the property was vacated.  And we said

19  that it was unacceptable for us to depend on the

20  fact that some government body was going to make

21  an unknown determination resulting in what we said

22  was the nonnegotiable term of delivering an

23  absolutely 100 percent vacant property.

24          So, yes, that idea was floated by

25  Mr. Shimshoni who said that he couldn't directly

1  cause the vacancy of the building, but that this

2  would be an indirect way of causing it so that it

3  would be the city that was doing it and not him.

4  We said that that was unacceptable.

5        Q.    Do you recall whether that was an oral

6  conversation or whether that conversation was

7  either through e-mail or in writing?

8        A.    I don't recall, but you can ask John

9  Cappa about it.  I'm sure he is very aware.  It

10 was categorically rejected -- it was a concept

11 that was categorically rejected by our side.

12       Q.    So it was Cappa that suggested that to

13 you?

14       A.    My understanding is that it was

15 Shimshoni that suggested it to us through Cappa.

16       Q.    Do you recall the time frame when that

17 discussion took place?

18       A.    Again, all these discussions took place

19 within a narrow period of time.  I don't recall a

20 certain date.

21             I do know that Mr. Shimshoni, according

22 to Mr. Cappa, was looking for ways to satisfy our

23 nonnegotiable requirement of vacancy.  And outside

24 of what we asked for, which was conveyance of a

25 vacant property, simultaneous with release of

1    closing monies, he was not able to propose

2    anything that was acceptable to us.

3         Q.    At what point in time did you decide to

4    try to contact Siena directly, Siena Capital?

5         A.    Well, it became obvious to us from the

6    public record that this matter between the lender

7    and the Mosley property was coming to a head, so

8    we decided to contact them and inquire as to

9    purchase of the loan documents.

10        Q.    Do you recall the timing of that?

11        A.    No, I do not.

12        Q.    Were you ever aware that Siena Capital

13   had entered into a forbearance agreement with

14   Mr. Shimshoni and the principles of the Mosley

15   Motel?

16        A.    I am not aware.  I am now after the

17   litigation, but I was not aware at the time of the

18   forbearance agreement or the terms of any such

19   agreement.

20        Q.    So you don't recall whether you first

21   contacted Siena before the negotiations with

22   Mr. Shimshoni and Mr. Cappa or after?

23        A.    I don't recall contacting Siena Capital

24   prior to my discussions with Mr. Shimshoni.

25        Q.    So you think that the first time you

1  contacted Siena would have been after the

2  negotiations broke down?

3       A.    As I said, I don't recall any

4  discussions that we had beforehand.  What I do

5  recall is that we didn't start discussing the

6  terms of any kind of acquisition until they had a

7  judgment in hand, or as I recollect, they had to

8  have a judgment before we could discuss terms or

9  make a deal.  But, no, I don't recall discussing

10  terms of a purchase prior.

11       Q.    How long did the negotiations take with

12  Siena before you were able to come to an agreement

13  to purchase the note and mortgage?

14       A.    Oh, I don't recall.

15       Q.    How much did you agree to pay for the

16  note and mortgage?

17       A.    $1.5 million.

18       Q.    Did you pay the $1.5 million?

19       A.    Yes, we did.

20       Q.    Approximately when was that?

21       A.    Toward the end of 2015.  About November,

22  I believe, of 2015.

23       Q.    So that allowed you to save $900,000?

24       A.    No.

25       Q.    So you were able to save almost $800,000

1    from what you would have had to pay for the Mosley

2    Motel --

3        A.    No.

4        Q.    -- had Mosley Motel and you come to an

5    agreement with regard to the terms?

6        A.    If they had accepted our terms, we were

7    prepared to proceed with the terms that we laid

8    out.  The purchase of a loan is very different

9    than the purchase of a fee simple interest with

10   clear title and vacancy in real estate.

11           So I reiterate my answer:  No, we did

12   not save $900,000.

13       Q.    When did you engage Mr. Ayers?  When did

14   you engage him as your attorney?

15       A.    After consummating the transaction in

16   which we acquired the loan documents in question.

17       Q.    Was there any particular reason why

18   there was no notice of assignment filed with the

19   court between November and approximately

20   January 16th of 2016?

21       A.    I'm not aware of a particular reason.

22       Q.    Were you aware that on approximately

23   January, the first part of January, January 4th or

24   5th, I believe, that Mr. Cappa contacted Mr. Ayers

25   with regard to the fact that Mr. Shimshoni had

1  **found an investor for the property or buyer for**

2  **the property?**

3          A.    I was told that an offer was submitted

4  at the time we were in the shoes of the lender,

5  so, yes, I was told.

6          Q.    **That that offer was rejected?**

7          A.    Yes.

8          Q.    **Any particular reason why you decided to**

9  **continue, why you hired Mr. Ayers?**

10          A.    Because of his familiarity with the

11  case, with the loan documents, with respect to the

12  nuances of the particular loan documents.  We

13  found it more administratively efficient to use

14  somebody that didn't have the ramp-up time that a

15  brand new lawyer seeing this case for the first

16  time would have had to have gone through and that

17  we would have had to pay for.

18          Q.    **Do any of the Altis entities employ any**

19  **ex-employees of the City of Saint Petersburg, to**

20  **your knowledge?**

21          A.    No.

22          Q.    **Do you own the property on 5th Avenue**

23  **known as the 5th Avenue Plaza?**

24          A.    I'm not sure which property you are

25  referring to when you say "5th Avenue Plaza."

1     **Q.   Have you purchased or do you have a**

2  **contract to purchase properties to the north or**

3  **south of the Mosley Motel?**

4     A.   We have options that are of record to

5  purchase property that is opposite the Mosley

6  Motel along 33rd Street.

7     **Q.   When do those options expire?**

8     A.   There are variable dates of expiration,

9  depending on when one is exercised or not, then

10  one is extended, but the outside date would be

11  about a year and a half from now.

12     **Q.   What is the option price?  What are the**

13  **option prices?**

14     A.   I would have to look at the documents to

15  answer that.

16     **Q.   How large are the parcels?**

17     A.   I would have to look at the documents to

18  answer that.

19     This is all public record, by the way.

20     **Q.   Do you have property known as the**

21  **Skyline Property?**

22     A.   Yes, I do.  Not I, but an Altis --

23     **Q.   An Altis entity.  Would that be**

24  **Altis-Aju Skyline?**

25     A.   Correct.

1      Q.    Do you know what the manager of that
2   property's name is?

3      A.    Gray Star Management.

4      Q.    Gray Star Management?

5      A.    Uh-huh.

6      Q.    They have their own employees then?

7      A.    Correct.

8      Q.    So Gray Star employs the actual people
9   in that property?

10     A.    Correct.

11     Q.    Is Gray Star an entity that you own or
12  affiliated with?

13     A.    Gray Star is the largest manager of
14  multifamily units in the entire country.  No, I do
15  not have any ownership or any affiliation with
16  them.

17     Q.    Have you or any Altis entity received
18  any tax abatement for this or any projects from
19  the City of Saint Petersburg?

20     A.    No.

21     Q.    Have you had any discussions or intend
22  to apply for a tax abatement with regard to your
23  perspective acquisition of the Mosley Motel?

24     A.    No.

25     Q.    Did you or any Altis entity or any of

1  your entities receive any funding or development

2  grants for any prior projects from the City of

3  Saint Petersburg?

4       A.   No.

5       Q.   Have you or any of your entities -- do

6  you intend to apply for any funding or

7  redevelopment grants relating to your perspective

8  acquisition of the Mosley Motel property?

9       A.   We have no such plans.

10      Q.   Have you or any of your entities

11  contributed any campaign funds for any current or

12  former elected official from the City of Saint

13  Petersburg?

14      A.   None that I'm aware of.

15      Q.   Are you aware of a commercial building

16  interior and tenant improvement grant program

17  offered by the City of Saint Petersburg.

18      A.   No, I am not.

19      Q.   So you have not availed yourself of

20  that?

21      A.   I think I answered before that we have

22  received no grants and we've applied for no grants

23  from the City of Saint Petersburg.

24           MR. TREUHAFT:  Let me have just a couple

25      of minutes.  We may be about done.

1                    (Thereupon, a brief recess was taken.)

2      BY MR. TREUHAFT:

3          **Q.    Mr. Guerra, would it be fair to say that**

4      **with regard to the initiation of the negotiations**

5      **with John Cappa, that Alex made the initial**

6      **contacts, and that at some point in time you took**

7      **over the negotiations?**

8          A.    I think I answered this earlier, but I

9      will reiterate it for the sake of clarity.

10                   Alex, as a finder and someone who

11     attempts to put deals together between different

12     parties, may have discussions prior to my

13     involvement, but since he is aware that he doesn't

14     have any authority to do anything or to bind us in

15     any way, at some point, he advised me that

16     Mr. Cappa wanted to contact me and enter into a

17     dialogue and a document exchange to see if there

18     was a transaction that could be consummated.

19         **Q.    Were the general parameters of that, of**

20     **the contract or potential contract, discussed**

21     **between you and Mr. Umana, or did he say I think**

22     **that they would accept X number of dollars or**

23     **anything like that?**

24         A.    I don't recall what numbers Alex may

25     have said or whether he discussed a range with us,

1  but the numbers became crystal clear when we spoke

2  to Mr. Cappa.  And he insisted on splitting the

3  purchase into two separate agreements, one for the

4  real property and the other for the personal

5  property.

6        Q.    Do you recall how the total number of

7  $2.4 million was arrived at?

8        A.    That's what Mr. Cappa said it would take

9  to get the deal done.

10        Q.    And that was in writing?

11        A.    Well, it was in his contracts, but we

12  spoke about it over the phone.  But it is what was

13  reflected in the contracts that he provided.

14        Q.    So that Alex' discussions with

15  Mr. Shimshoni prior to your negotiations with

16  Mr. Cappa would have just been preliminary

17  feelers?

18        A.    Oh, absolutely.  I mean, they could only

19  be exploratory in nature when he has no authority

20  or authorization from us to act on our behalf or

21  to bind us in any way.

22        Q.    Are you familiar with an entity called

23  Altis-Aju Kingwood?

24        A.    Yes.

25        Q.    Is that one of your entities?

7733561f-db25-4738-acf8-a19dd141fc33

1      A.    Yes.

2      **Q.    Who is Ariana Cabrera?**

3      A.    Ariana Cabrera was the general counsel

4 for our largest investor.

5      **Q.    Would that be Alberto Suarez?**

6      A.    I'm sorry?

7      **Q.    Would that Mr. Suarez?**

8      A.    Mr. Suarez and various extend members of

9 his familiar.

10     **Q.    And this is the A.J.U. distinction**

11 **because this was a project Mr. Umana would have**

12 **found?**

13     A.    Yes.

14     **Q.    And that he then would have received a**

15 **finder fee for?**

16     A.    Yes.

17     **Q.    But not one that he hold any type of**

18 **membership or other interest?**

19     A.    He does not hold any interest in that

20 entity.  That entity actually is defunct.  That

21 property was sold two years ago.

22     **Q.    It hasn't been dissolved yet.**

23     A.    I understand.  That's only because of

24 post closing -- you know, filings and closing out

25 with respect to IRS filings, but we do not own

1    that property anymore.

2         **Q.**    **Not to belabor the point but to try to**

3    **summarize your testimony with regard on the FL**

4    **6801 Spirits LLC, you have no -- you filed this on**

5    **behalf of this Altis-Aju entity completely**

6    **unauthorized?**

7         A.    I don't see any filing by the Altis-Aju

8    entity.  I see them listed on an exhibit.  The

9    filing was actually made by a Joshua Korotkin.  I

10    don't see a filing that was made by an Altis-Aju

11    entity.  And moreover, as I stated early, there is

12    no such thing as Altis-Aju LLC.

13         **Q.**    **No.  I understand there is no Altis-Aju**

14    **LLC, but oftentimes in Bankruptcy Court documents,**

15    **you only have so much space, and sometimes names**

16    **are abbreviated.**

17         A.    Well, it seems to me there is plenty of

18    space.

19         **Q.**    **It would be the Altis-Aju Skyline**

20    **property.**

21         A.    It appears to me there is plenty of

22    space to add more there.  I don't know who

23    compiled this exhibit, but can I tell you that it

24    is incorrect on its face.  And I'm not sure who

25    filed it or who included that name on this exhibit

1    and where they got it, but I do not see a filing

2    by Mr. Umana at all.

3         Q.    **Part of the Class D are interested**

4    **parties.  I would have to delve deeper into that**

5    **bankruptcy or bankruptcy docket to determine**

6    **exactly what's going on there.  It does appear**

7    **that he filed some documents and he is obviously**

8    **on the notice list.  So you can understand how I**

9    **found that interesting.**

10        A.    I find it misleading.  There is -- you

11   are making a presumption that there was a filing

12   made by Mr. Umana for an entity that doesn't exist

13   and you are asking me about it.  And not only did

14   I know nothing about this action pending in New

15   York, I've never heard of FL 6801 Spirits LLC.

16             All I'm looking at is an exhibit

17   compiled by an unknown person, which could have

18   been the debtor themselves, listing interested

19   parties that they want wiped out through a

20   bankruptcy proceeding.  I don't know.

21             MR. TREUHAFT:  I have nothing further of

22        this witness at this time.

23             MR. AYERS:  Mr. Guerra, I just have one

24        or two questions.

25                       CROSS-EXAMINATION

1  BY MR. AYERS:

2       Q.    **Mr. Umana, what is your understanding of**

3  **his business?**

4       A.    I think, as I summarized earlier, he

5  runs around trying to put different parties

6  together to see if a transaction can be

7  consummated, and then negotiate some sort of

8  compensation for bringing people together to buy

9  business ventures or investments, or something of

10  that nature.

11      Q.    **Do you know if he holds a Florida**

12  **broker's license?**

13      A.    I am not aware one way or the other.

14      Q.    **Does or did Mr. Umana have an exclusive**

15  **relationship with you and/or any of the Altis**

16  **entities?**

17      A.    Absolutely not.  I can list the various

18  acquisitions we have made that have no involvement

19  on the part of Mr. Umana.

20      Q.    **How many real estate projects are you**

21  **and Altis entities currently actively involved in?**

22      A.    Well, let's see.  We have about ten.

23      Q.    **And of those, how many did Mr. Umana**

24  **find or have a participatory role in finding?**

25      A.    Two.

1          Q.    With respect to Exhibit 1, that

2    Affidavit of Service in the New York bankruptcy

3    case, is it your understanding in looking at that

4    document that it was involving some type of sale

5    of property in that bankruptcy?

6          A.    In the FL 6801?

7          Q.    Yes.

8          A.    As I said, I'm not aware of this case.

9    I haven't gotten into the details of it

10   whatsoever.  Today is the first time that I've

11   ever even seen of it or heard of it.

12         Q.    Do you have any knowledge as to whether

13   you or any Altis entity filed any paper of any

14   kind in that bankruptcy proceeding?

15         A.    We absolutely did not.

16         Q.    Do you have any knowledge as to whether

17   Mr. Umana ever filed any notice or paper of any

18   kind in that proceeding?

19         A.    Not that I'm aware of.

20              MR. AYERS:  I don't have any further

21         questions.

22              MR. WOLFGRAM:  I don't have any

23         questions.

24              MR. TREUHAFT:  No redirect.

25              MR. AYERS:  Mr. Guerra, this concludes

1        the depo.  Obviously from your experience, you

2        have the right to read and sign this

3        deposition if it's transcribed.  I usually

4        recommend that it be reviewed, but I leave

5        that up to you as to whether you wish to do

6        that.

7                THE WITNESS:  Sure.

8                MR. AYERS:  If it's transcribed, the

9        court reporter will contact you.  Make sure

10       she has your contact information and address

11       where she can get in touch with you to review

12       it.

13               THE WITNESS:  Okay.

14               MR. TREUHAFT:  We are going to order the

15       transcript.

16               MR. AYERS:  Obviously I'll take a copy.

17       This is Mr. Ayers.

18               MR. WOLFGRAM:  The City will also take a

19       copy.

20               (Thereupon, reading, signing and notice

21       of filing were not duly waived, and the

22       deposition was concluded at 12:48 p.m.)

23

24

25

1

2
_____
Witness

3
Sworn to before me this _____ day

4

5
of _____, 2016.

6

7
_____

8
Notary Public

9
My Commission Expires:

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2    THE STATE OF FLORIDA

3    COUNTY OF MIAMI-DADE

4

5

6         I, the undersigned authority, certify that

7    FRANK GUERRA personally appeared before me and was

8    duly sworn on the 1st of April, 2016

9

10        Dated this 14th Day of April, 2016

11

12

13

14        _____

15        JOAN OCKER
          Notary Public - State of Florida
16        My Commission Expires:  01/12/2018
          My Commission No.:  FF068061
17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E
2

3    The State Of Florida

4    County Of Miami-Dade

5            I, Joan Ocker, Court Reporter and Notary
     Public in and for the State of Florida at Large,
6    do hereby certify that I was authorized to and did
     report said deposition in stenotype; and that the
7    foregoing pages, numbered from 1 to 62, inclusive,
     constitute a true record thereof.
8

9            I further certify that said deposition was
     taken at the time and place hereinabove set forth
     and that the taking of said deposition was
10   commenced and completed as hereinabove set out.

11           I further certify that I am not of any
     counsel, I am  not related to nor employed by any
12   attorney in this case, nor financially interested
     in the outcome thereof.
13

14           The foregoing certification of this
     transcript does not apply to any reproduction of
     the same by any means unless under the direct
15   control and/or direction of the certifying
     reporter.
16

17           Dated this 14th day of April, 2016.

18

                    _____
19                  Joan Ocker, Court Reporter

20

21

22

23

24

25

1    DATE:  April 14, 2015

2    TO:  Frank Guerra
          901 Ponce de Leon Blvd., Sute. 401
3         Coral Gables, FL  33134

4    IN RE:  Mosley Motel of Saint petersburg, Inc.
     DATE TAKEN:  April 1, 2016
5
     Dear Mr. FRANK GUERRA:
6

7         Please be advised that your deposition

8    taken in the case and on the date described above

9    has been transcribed and is ready for your review.

10   Please contact us for an appointment to read and

11   sign this deposition at your earliest convenience.

12        The Transcript will be sent to counsel with

13   or without your signature in 30 days or at the time

14   of trial, whichever comes first.

15        Our office hours are 9:00 a.m. to 4:30

16   p.m., Monday through Friday.

17        If you have any questions regarding this

18   matter, please feel free to contact us at the above

19   number.

20                     Sincerely,

21                     _____

22                     Joan Ocker, Court Reporter
                       Prose Court Reporting
23
     I do hereby waive my signature.
24
     _____
25   FRANK GUERRA

1              C E R T I F I C A T E

2                      - - -

3    THE STATE OF FLORIDA

4    COUNTY OF MIAMI-DADE

5         I hereby certify that I have read the

6    foregoing deposition by me given, and that the

7    statements contained herein are true and correct to

8    the best of my knowledge and belief, with the

9    exception of any corrections or notations made on

10   the errata sheet, if one was executed

11

12        Dated this _____ day of _____, 2016.

13

14

15

16

17

18   _____

19   FRANK GUERR

20

21

22

23

24

25

1          E R R A T A   S H E E T

2  IN RE: MOSLEY MOTEL OF SAINT PETERSBURG, INC.

3  DEPOSITION OF:  FRANK GUERRA

4  TAKEN: Friday, April 1, 2016

5   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

6  PAGE #   LINE #    CHANGE            REASON

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 Please forward the original signed errata sheet to
   this office so that copies may be distributed to
21 all parties.

22 Under penalty of perjury, I declare that I have
   read my deposition and that it is true and correct
23 subject to any changes in form or substance
   entered here.

24
   DATE:_____ SIGNATURE OF
25 DEPONENT:_____